Our final case this morning is number 241078, Duke University v. Sandoz. Allergan got this patent in 2017 after Latisse won and after Sandoz's launch, and we're here today on several issues that relate to that. One, preclusion. Two, the failure to give the teaching away during instruction. And three, the lack of written description support in the original specification. I'd like to start, if I may, with preclusion. I think that the key point in understanding this court's decision in Latisse 1 is that the district court considered the same combination of references that Allergan was able to retry here. And the district court in Latisse 1 concluded that you wouldn't combine those references because amids activate a different receptor. And this court corrected that error on appeal and said that, in fact, the teachings of the prior art were that Johnstone, the reference that taught the hair growth utility, taught squarely toward a new utility for a finite set of already identified and isolated compounds. Specifically all the compounds in the 819 patent, and did not limit itself to those that bound the FP receptor or a variant. That's at page 963 of Latisse 1. And I think that understanding Latisse 1 in that way deals with both the other side's assertion that this case involves a different issue, and the other side's assertion that it somehow wasn't relevant to the outcome in Latisse 1. Because what this court did was it concluded that the district court's finding that you wouldn't combine those references rested on legal error. It looked second. Here's my problem with your collateral estoppel argument. As I understand it, in Latisse 1, we said we have a very broad claim, and at least one point within that broad claim was obvious. Today we have a review of a very narrow claim that is maybe a subset of the broad claim we considered in Latisse 1. And it may be that the point within that broader claim that we're concerned with today is also obvious, but it may be that it's not obvious. Therefore we have a fact dispute, and it was proper to try this. What's wrong with that analysis? A couple things. Let me just note parenthetically that it's narrower in some respects. It's actually broader in at least one minor respect. But what matters for these purposes is it is not different in any material respect. Here's why. Because if you combine John Stone's teaching about hair growth from compounds that treat glaucoma with the list of compounds isolated and identified as treating glaucoma in the Woodward patent, a 19 patent, the question is whether this court in Latisse 1 limited itself to some subset of those and said, we don't need to look at the amids because they bind a different receptor. That perhaps could have been a way that this court could have decided that case, but that is not what the court said. But it seems we had no reason to be thinking about that very question. It wasn't presented in that case. Oh, I disagree, Your Honor. The district court's reason for why you wouldn't combine these references was that amids are bad because they bind a different receptor. Amids are undesirable. And this court said that the teachings of John Stone was that these PGF analogs were desirable irrespective of whether the activity that had been identified. I thought we essentially said the claims there were not limited to amids. So the district court in that first Latisse 1 was too narrowly focused. And then we invalidated based on other reasons. So the district court was too narrowly focused, and the court did say that. But none of the stuff about the receptor that the court discussed at both page 963 and 964 would have mattered if the reasoning had been what Your Honor said. Because the court could simply have said, well, the Woodward patent includes compounds that don't bind to the variant receptor. Instead, it said something broader and directly relevant to this case. And at a minimum, Allergan shouldn't have been able to relitigate this specific point. And that is why we proposed as an alternative that the jury be instructed and there be a motion to eliminate on the additional findings, findings 3 and 4, and an expanded version of finding 2, which the district court withheld. But ultimately, what happened in this case was that the other side was able to argue to the jury that Johnstone taught away from using the amid compounds. And that teach-away problem, A, was exactly what this court rejected in Latisse 1. The court said in Latisse 1 that silence does not imply teaching away. And then, as I hope we'll get to in a moment, the district court then didn't even tell the jury what it means to teach away and allowed the other side to argue that for exactly that, that silence is a teaching away. What is it that you wanted the judge to tell the jury with respect to teaching away? What was the instruction that you asked for? We proposed a one-sentence addition to the jury's instruction, which you can find at page 7805 to 06 of the appendix. And what we proposed was that the court say, a prior art reference teaches away from an invention when it criticizes, discredits, or otherwise discourages the solution claimed in the patent. The district court acknowledged that. Did you need to add, and silence is not enough, in order to cure the problem? So we had proposed an earlier version that said what teaching away is not. The district court didn't like that because it was too negative. And so we proposed an alternative instruction that said what teaching away is. So I don't think it was necessary to cure the problem. This was the instruction that we proposed. And I think that if you look at the slide that the other side put up that said, science teaches away from invention in two ways, referring to both the silence on amidst and the idea that the other end, quote, better not be fennel. Neither of those would have stood up on the correct understanding of teaching away. To be clear, the disputed instruction that's before us now is the one you read. It's not the silence one, correct? That's right, and it wasn't limited to that. My concern about this argument, I think, in hindsight, sitting here not at trial with a whole bunch of things going on and trying to figure out the right jury instruction, seems relatively clear to me that your extra sentence should have been given, it's a correct statement of law. But it seems like an awfully thin reed to send back a case, putting aside all your other arguments for the moment, to have a whole new, probably one week trial, just because one sentence is missing from a jury instruction. And that sentence doesn't even really say what you're arguing here, which is that silence is not teaching away. Can you give me some comfort on why this error is just so profound we need a whole new trial? A couple of things, and I'll just note parenthetically that I think a retrial would be considerably shorter, in part because, for example, the other side tried to prove willfulness. They had that resolved against them at mid-trial. And so some things that were tried in this case would be out of the case. But let me answer your question as directly as I can. The central question in this case was whether you would combine Johnstone and  The active ingredient in Lateef's bimatoprost is disclosed explicitly in Woodward, along with the two other amid compounds that are the focus of this claim. And Johnstone taught the utility of compounds that treat glaucoma by reducing intraocular pressure. So the central question was, would you combine these references? And the other side was allowed to tell the jury, through their expert, repeatedly, three different times and then again in closing, that Johnstone taught against using Woodward's amids because Johnstone would have said something about amids if it had wanted you to use them. Because Johnstone didn't select them. Because Johnstone didn't select them. But what our friends on the other side said at closing was, Johnstone rejects amids. And they get that from silence. And so the centrality of teaching away to the obviousness case that they tried, I think really, especially under the Tenth Circuit's standard for prejudice in a jury instruction case, I really don't think the court can say with confidence that the result would be different if this had been disallowed. Can I ask you to turn to written description? Unless you had another question. I was going to ask about written description. Great. So I'm a labs chemistry major, so I may not get this right. The way I read the specification on written description issue is that we're particularly concerned with the R1 area. And if I read it correctly, I see the specification as having three blaze marks, which lead in different directions. And one of them is the column eight, the preferred compounds, of which the plank compound is not one. A second blaze mark, which Duke relies on, is the statement of a witness who said that somehow there was a suggestion that hamides might be preferred, which would include the plank compound. And then the third blaze mark is in the synthesis discussion, where the specification suggests that the synthesis would lead you to a sulfanamide, which is not one of the plank compounds. So there are three possible blaze marks here. And I'm wondering how one would know which one of those three to follow, because at least one of them, the preferred discussion in column eight, leads you to a huge number of compounds, which probably wouldn't satisfy written description. So that's sort of my take on it. I agree with much of what your Honor said. The one thing that I want to come back to at the tail end of responding to this is that don't overlook Z, because the Z position is not irrelevant. Our friends on the other side tried to dismiss it as irrelevant, but their own expert agreed that the end of the omega chain was important as well. And I would refer you to page 106 to 107 for that. And then, of course, in written description, it's going to be the whole combination together that has to be supported. But you're right that the blaze marks are different. And I just want to highlight that in the synthesis schemes, and I think the testimony is about the synthesis schemes, unless you're referring to something that I'm not recalling, that in the synthesis schemes, each of them says that the compound can be, that R1 is as described above in column eight. So in other words, these synthesis schemes are for making any R1. And then it gives at the end of two of them, it gives as an example, you can manipulate the C1. And, for example, you could make a sulfonamide, you could make an amide, and so on. So those don't point to the claimed amides, which I think that really is the dispositive point. That an amide is one thing, there are only three claimed amides, and there's nothing in the synthesis schemes whatsoever that points you there. But I think to take a step back, the other side's testimony focused on preferred embodiments, or preferred... Well, there's no testimony by their expert reconciling those three possible approaches and saying, well, reading the patent as a whole, the guidance provided in column eight wouldn't have been taken, and we would have taken this somewhat passing reference to the amides as being the guidepost, right? I mean, there's just no reconciliation of that. I mean, to the contrary. I mean, if you look at the way that their expert was walked through the specification, they asked him to find each group in the specification on exactly the kind of hindsight-based treasure hunt that this court in cases like Fujikawa has said is not how written description is supposed to work. It's not supposed to be from a hindsight perspective. You have to have blaze marks in the specification that point you not just to preferred embodiments, for example, but to the entire combination. And there's no reconciliation of the other side's testimony that sometimes you look to the preferred group, but sometimes not. So I'm agreeing with Your Honor's point that there is no... The testimony doesn't stick together and point to the compounds as a whole. It just went hunting for references to each individual functional group. Can I ask you on the R1, you know, there's, as I understand it, 13 different groups that could be at the R1 in the specification according to that discussion column eight. And one of them is the R1 that would satisfy the claim, right? Fall within claim 30. Just for the R1, I recognize there's other differences. But why isn't that enough? And I'm just kind of thinking about that point that was made about how, you know, you're not looking at a forest here. You're looking at a backyard. And so with that focus there, why isn't that enough legally? Because, I mean, I hear your argument. My big concern is that I've got a dirty verdict, right? It's a fact question. So just trying to understand what the test is and why is this situation not enough as a matter of law. So it is a fact question. But in cases like Novozymes, Centochor, Nouveau, this court has found a complete absence of factual support for written description, even though it's a fact question. And I think I'm going to give you two reasons why that's the case here. And one, it's not 13 trees. This is 13 forests. Because each of these, it may be described in a couple of words, but then if you look at Columns 4 to 5 of the patent, you'll see just how broad each of these categorical descriptions is. What about the one that relates to the claim here? Is that one broad too? Well, so yes, because this one is amid, and then it has hundreds of embodiments disclosed in it. But it's all claimed? No, only the three amids. Now, I'll acknowledge that once you get to that non-preferred amid embodiment, that once you look into the specification about which is the preferred version of R3, you will see that phenyl, ethyl, and isopropyl are among the preferred embodiments of R3. But you have to get to R3 first. And the number of options both within R1 and R3 are quite significant. And I would just urge you, each of the categories in R1 is defined in quite some detail in Columns 4 to 5. And you'll see just how much, for example, a heterogeneous group, how much variation it can have. It can have anywhere from 1 to 18 atoms. It can have any, the hetero atom, the non-carbon atom, can be just about anything. There are at least three preferred options. So just that by itself, I think, is the answer to your tree use question. And then I just want to circle back to Z, that in this case, there's a complete lack of testimony, complete lack of testimony, of how you get phenyl out of the specification for Z, because there are experts skipped over. The aromatic step?  So, you know, whether Z would be aromatic and then within the aromatic, there is a statement in the specification about what's preferred, right? That's right. But, again, same question, though. If aromatic is one of eight possibilities, why isn't that limiting it to a backyard as opposed to a forest? I mean, same answer, right? So one of those eight options, for example, is a substituted heterocyclic compound, I believe. And if you look at the definition of substituted, it can be any halogen. It could be, the options go on and on, and you'll find that in columns five to six, I think. So I think that just the fact that each one is a forest, the other side certainly tried at trial to make each of these categories look like a single tree. But once you, you know, to return to the blazemarks metaphor, like each of these is a path that splinters into dozens and dozens of subpaths. And before you got to amide, you would have passed the turning for amides, because there's no blazemark that takes you there. My colleagues, I had two questions. I'll try to answer quickly, if you could. Judge Stahl, I think, is referring to testimony that your expert gave that the jury could have reasonably thought was him agreeing these are just trees or a backyard and not a forest. Isn't that a possibly fair interpretation of what your expert said? It's not for two reasons. I mean, one is that trial counsel certainly tried to get him to say that and interrupted him in the middle of an answer at page 10519, where he said there's so much variety within each of them. And then if you look at pages 549 to 550 of the trial transcript, that's his redirect on this point, where he explains in some detail why each of these is actually a more detailed category. And then the efficacy, you say, I think, is a completely independent ground for finding lack of adequate written description, that the claims have to allow for growth of every type of hair in every type of mammal. Am I right that you say that's an independent failing on written description and there's not a lot of briefing or I'm not sure there's really any evidence on this? What do I do with that? Our emphasis is not on the kinds of hair or the kinds of mammals. It really is just on would the compounds in there as a combination grow hair? And there certainly is testimony on that, and I think about whether it would grow eyelash hair in humans. Can I just focus the dispute on that for purposes of understanding your appeal? Yes, I think that that's basically right, but that the other side tried to say that the amides would grow hair. But remember, it's the whole molecule that has to be involved, and I would just take you back to the Reeds testimony that I read you before at 10678, saying that the end of the omega chain is also important. Thank you. Okay, thank you. I'll give you two minutes for rebuttal. Mr. Lampkin. Thank you, and may it please the Court. I think I would begin with where my colleague began, which is the preclusion and then the instruction on teaching away, and then turn to written description. And on preclusion, Sandoz is asking this Court to effectively commit the same error that the district court committed in Lattice 1 and that led this Court to reverse, which is to ignore the scope of the claims. The claims in Lattice 1 have to be identical, and the resolution has to be necessary to the decision for Estoppel to apply. But here the issue is entirely different, because the claims in Lattice 1 were enormously broad. They included things like carbolic acid and esters, and those carbolic acids were in the prior art, and they, quote, were not limited to compounds with a C1 amide group, which is why the Court said that the challenger did not have the exacting burden of showing a reasonable expectation of success in using the narrow class of PGF analogs with C1 amide groups. But that narrow, that burden, that exacting burden, is exactly what Sandoz has here to show that it would have been obvious to use PGF analogs with C1 amide groups at the C1 action end. That makes a difference, because the Court reversed the district court because it looked only at amides. It was a mistake to look at amides. The Court should have looked at the full scope of the claims. And because of that, there's no reading of that decision that makes sense, that that decision actually says that having amides at the C1 action end is obvious. It would have made the entire first three quarters of the Court's decision superfluous. If amides at the C1 action end were obvious, the Court didn't have to talk about claim scope. It didn't have to say, go through all the analysis and say, look, you only look to see if any embodiment is obvious. It wouldn't have to go and say that the claims include carboxylic acids and esters. It wouldn't have to say that carbolic acids and esters are in the prior art. There would be no reason for any of that. For that same reason, any decision regarding amides, if you tried to read the decision as reaching amides, wouldn't be necessary to the Court's decision. It needs to be not merely actually decided, but necessarily decided. And there's simply nothing necessary about reaching to amides. When the Court, once it found that carbolic acids and esters were claimed, and once it found that those were disclosed in the prior art, that was the end of the game. That would have meant that the claims were not, the claims were obvious. And with respect to whether or not, I'm sorry. You might want to focus more on written description.  And the jury instruction. Okay. So if we start with the jury instruction in that case. For as initial matter, that objection is doubly forfeited. At the time the testimony came in, there was no objection on the grounds that Sandoz is giving here, which is that describing that... They're not concerned about the testimony having come in. They're concerned that the jury was not told what the law is on teaching away, which is essentially that silence is not teaching away. Well, certainly... I don't see how that's forfeited. They complied with the jury instruction timing.  Well, insofar as the objection is they needed the instruction because it was wrong on the law. That had to come when that testimony came in. Again, you've got a curative instruction. That does not constitute teaching away, even though the expert said it was teaching away. But turning away, they didn't preserve it with the jury instruction objection? No, Your Honor, because when you think something is wrong as it's given, it's not properly described as teaching away. You would want a curative instruction in that moment. You don't wait until days later where it's not... You might want it, but you don't... I don't know that you have any authority for the proposition that if you don't stand up and object to everything that's not legally correct in a testimony, you can't ever ask for a correct jury instruction. I think the Tenth Circuit's decision in Diggs is actually supportive of that. But even if the court disagrees with me, there is actually no error here because what the expert... And this is what the district court was explaining at 10,766. This expert was merely making the fair point that Johnstone doesn't mention the Woodward's amnesty, that it's silent as to those. And under this court's decision of Polaris, that's relevant. You were arguing that silence is teaching away and based on your expert, right? No, Judge Sike, I think my argument is different. Because if you go to the... Our expert was testifying. What's relevant here is under Polaris, if you don't mention something, if you state a preference for other things, that's relevant to motivation combined. It's relevant. It's something the jury can consider. And if you look at the instruction here that was given on teaching away, the jury wasn't told teaching away has a special effect, that it forecloses motivation combined, that it has some particularly powerful impact other than it's something that can be considered. It was only told to take it into account. But that is also a correct instruction for what our expert, Dr. Reitz, was saying. When you combine it, your expert said that Johnston taught away. You have to concede he said that. Of course. But you can't find prejudice because even if what he said wasn't teaching away, the jury instruction only said... What it said about teaching away was equally true of what our expert was talking about, which is stating a generalized preference that doesn't include something. That's something the jury can take into account too. The jury could take into account teaching away. It could take into account a generalized preference against. So failing to distinguish... Wait, I'm not following that. I mean, clearly he said the word is teach away. It teaches away. He says it twice. So what are you saying about the instruction that was requested that would make that okay? So if the court turns to 10482, which is the instruction that mentions teaching away, all it says to the jury is that you can take into account factors such as... And it includes whether the prior art teaches away. Well, that's exactly the problem. That testimony was permissible under the instruction that was given and wasn't permissible under the instruction that was rejected. So if that instruction had said you may take into account factors such as the fact that something is silent and has a preference against a particular compound, that would also be a correct instruction. And so it's simply not prejudicial that this got lumped in as teaching away as opposed to you can consider teaching away, you consider something that... Well, it hadn't been given the label teaching away. Pardon? It was given the label teaching away in the closing by the expert, right? Yes, I think that's the only difference here that they're complaining of. They said it was a mistake to use the label teaching away. But taking into account the factor what the expert actually said was something that the jury was allowed to take into account. And the instruction doesn't say, hey, you have to give this special effect because it's teaching away. The jury was also allowed to take this into account. In fact, it would have been misleading to the jury to limit it to say you can only take into account teaching away because then that would imply to the jury that you can't take into account the fact that... But no one asked the judge to do that, so that's irrelevant. What they asked the judge to do was give affirmative examples of what teaching away is. And for some reason you objected to that and it left the jury, I think, with a misunderstanding of what the law is. So, I mean, assume that's what I think. Can I still affirm here? Yes, because the error was absolutely harmless beyond any doubt because what the jury would have considered teaching away was merely something it was allowed to take into account. And what the jury considered as teaching away was something that it could take into account. And the instruction doesn't tell them anything about teaching away that's any different than what you instruct them with respect to what doctor... To make sure I understand your point, are you saying because they weren't told that if something teaches away per se isn't obvious that we don't have to worry about the use of that label? Judge Dole, that is a much better explanation of what I'm saying. What was described as teaching away here and how the jury would take it into account is a 100% perfectly accurate description of how you would treat the testimony that Dr. Reitz gave, that Johnstone states a preference that excludes amates. That's something you're allowed to take into account when they're addressing obviousness. Or when they're addressing... Yeah, when they're addressing obviousness. Do you want to talk about written description? Yes, why don't we go to written description? So, Sandals' client has a doubly high burden here. It's not merely that they have a clear and convincing burden before the jury. They have to prove to this court that no reasonable jury could think they failed to meet that clear and convincing standard. And there's two key points that make it clear that the jury could reasonably find they didn't meet that very demanding burden. And the first is the testimony of the experts, their expert, our expert, was that they only gave 13 compounds for the R1 position and that you could easily visualize all 13. Sandals' expert, Heathcock, admits the patent discloses this is at 10,518, discloses the 13 options. None of the 13 options include hundreds of thousands of compounds, right? Well, if... So our expert explained that there was only a limited subset that could be expanded, and that's at page 10,671. But in addition, look, there's nothing that Sandals puts forth that says, gee, skilled artisans would have understood all of these to be sufficiently meaningfully distinct, that they're not brown cowboy distinctions. The column 8 is that there is a reference to the most preferred option, and preferred options, and the compound that's being claimed here doesn't fit into either category. It's correct that that is not given as preferred in that instance, but the jury looks at all of the evidence. And the first piece of evidence is we have a very limited set, 13 options, and the one that's very clearly set forth, it's not a lot of options, it's amides, it's right there set forth as one of the options.  Pardon? Which is not preferred. Which is not listed as preferred. But then it goes on that every... The question is, put a skilled artisan in visualize, understand that you had possession of amides, and looking at it specifically put forth as one of the 13, every expert agreed that you could visualize it there. Heathcock said that it was a tree, not a forest. He said that he could visualize it. That's at 10,519. I would encourage the court to read that examination, because it's very clear that he's conceding, yes, I could go one by one and visualize that one. Even when you take into account the redirect? Yes. The jury is not required to believe that the effort to... No, we have to say it's reasonable for them not to have concluded that their total was clear and convincing. And they also had Dr. Reitz, who's not subject to a redact, who says that a skilled artisan looking at the specification would have no trouble visualizing the claimed prostamides. That's 10,670 lines 1 to 3. It's right in that record. But going to the other thing is, in addition to actually being only one of 13, the specification, so we've got a narrow class, Abbey v. Janssen, we have that narrow class. That's really important to whether or not you can visualize that. But how do you get around the fact that this one isn't the one that's not labeled preferred? So even though it's not labeled preferred... Surely the reference to other compounds or classes of compounds being preferred leads away from this one, right? But still, it's clearly one of 13. Yes, no? Potentially, but it's only one of 13, and there's other places in the specification that point right at it. For example, at page 10,000, 2525, Heathcock concedes that the inventors quote, called out the amides as something they were specifically interested in by putting them in each of the four disclosed synthesis schemes. Dr. Reitz, our expert, says the same thing. Each of the four synthesis methods testifies. Provides for preparation of amides. Earlier, I gave a hypothetical or an explanation that there are three blaze marks here, which lead you into different paths. And there isn't any reconciliation by your expert or anybody in the record as to why you would choose that paragraph in the synthesis discussion as the guidepost as opposed to the other possible guidepost, which the end product of the synthesis is to reach a supplement animal. If that were true, Judge Dyke, you're interrupting me. I apologize. Or the preferred options in column eight. So if that were true, that would mean that Sandoz has to lose because it's their burden by clearing fencing evidence. And then on top of that, it is not, in fact, true. Why do they have to lose? If there are three possible paths here, nobody tells you why you would reject the column eight path. Why isn't someone who's looking at this left with no guidance as to which path to follow? Because the question is, for written description, would a skilled artisan be able to visualize? Would a skilled artisan be able to recognize? Would a skilled artisan know that you have possession of the compound, of the claimed compound? And the answer is going to be clear because if there's only three Judge Dyke, they would be able to visualize all three. If there's 13, the testimony is you can visualize all 13. It's not that hard. Does that test what you just said, does that argument require me to agree that when I look at the 13, it's just 13, as opposed to each one of them themselves being a vast number beyond 13? Each one could be hundreds of options. Yeah, and I think the answer is no because there's no testimony that says that when you look at these, the skilled artisan's going to think, well, these are all vastly different and the jury's required to accept that these are all so vastly different that the skilled artisans wouldn't be able to do it. And Heathcock himself said, gee, I can look at these 13 and I can visualize each one of them individually. They were all vastly different things. They were so different, he would not have been able to say, yes, I can visualize them all out one by one, that there's 13. He wouldn't have admitted that it was a backyard, not a tree. But didn't he have an obligation to make sure that he didn't oversimplify it into just 13 categories and talk a little bit more about all the possibilities within those categories? So if he said he, if that were such an oversimplification. Conclusory or not supported by substantial evidence kind of thing. No, I think, again, the burden is on Sandoz. But if there were these amazing numbers of compounds that skilled artisans would have thought were very different and there were tens of thousands of them, somebody's not going to be able to visualize each of them and say, oh, that's just merely a backyard. That's just simply contradicting what the expert said. It's contradicting what our expert said. It's 13 meaningfully different compounds and amide stands out. There's no question about how broad amides are and it's right there as one of them. And then there's synthesis schemes over and over again. Four different syntheses specifically call out amides each time. The jury, the expert admitted that this is something that somebody would be, that it would be called out as something that inventors were specifically interested in. This is simply not a case where you have billions of possibilities and the skilled artisan is on a hunting expedition. It's a narrow set of claims and it points directly to it through the synthesis schemes, through listing the amides as one of 13. And it's simply just not the case you can say, oh, the jury didn't have enough evidence there. Especially on the Z and I don't want to lose sight of that. I understand how the patent says if you get to aromatic groups, fennel is most preferred, I think. But what blaze mark is there in the patent that tells me I should get to aromatic groups among a choice of, I think, eight different types of groups listed for Z? So again, that's a maximum of eight. This is way beyond a forest. This is just talking about an even smaller backyard. Maybe you'd have an Arlen. But I think within those eight are multiple possibilities, correct? So I think in addition to saying among aromatics, fennels are most particularly preferred. If you take a look at the embodiments that are set forth, there's at least 10 of them that are compounds using fennel for Z. So it's pointing to fennel in particular, which is a subset of aromatics. If you look to appendix 136, column nine, the bottom one, that's a fennel. 138, column three, top and bottom ones are fennels. Is there any testimony at trial from which the jury could have found at least that there's not clear and convincing evidence that you wouldn't head towards the fennels? I know there's a lot of negatives, but I think you follow me. What's the testimony on that point? I think the testimony on both sides for fennels is relatively thin. But the patent itself is very clear in calling out fennels over and over again. Is there any testimony you can point me to that would support a finding that a person of skill in the art would think that the aromatic groups is supported by a blaze mark in the patent? Oh, the aromatic groups are supported by a blaze mark? Because I'll give you, you know, the patent says fennels are most preferred once you get to aromatic groups, but I'm stuck on what's the evidence supporting you would get to aromatic groups. Right, I think the first is that the aromatic groups are just one of eight, but the testimony was that the backbone consists of X, Z, and R2, X and Z being their thing, and that the backbone does not make a difference. And then when the backbone doesn't make a difference, the skilled artisan isn't going to much care about whether it's fennel or not. It's just simply not a material difference. So you're contending, we should say, there do not need to be blaze marks for what's placed at Z? Right, I think a skilled artisan would understand that the essentially generic backbone includes Z, and you don't need blaze marks, because that's what's going to make a difference for the binding, is the C1 action end, and Sandoz-Heathcock admitted that, and Reitz agreed, but even apart from that, if you're looking for fennel, which is what the claim is, that's replete through the patent. And what I was pointing to, and we pointed to in the brief, is like when you look at the examples, time and time again, it's not merely an aromatic group, it's fennel, fennel, fennel. Did you say there's 10 examples with fennel? Yes. Out of how many examples? It's 90-something, right? Yeah, so this is the second highest group of anybody. So it's like if a skilled artisan's looking at this, they're going to realize that fennel is very important. So it's number two. The thing I'm concerned about, if it was like 10 out of 20, sure, but 10 out of 90-something? I think it's more like 10 out of 40, but if you look on every page as you walk through, there's usually six to eight a page, and fennel is almost always one of those top, so for example, if you look at appendix 150, second up from the bottom, and the top one, those are both fennel. Time and time again, the fennel's called out in these examples, and to say that the jury is required to ignore that, that here it is, over and over again, fennel, and the juries have to say, well, gee, I can't tell which one of the eight, that doesn't make sense. But even if we say eight possibilities, including fennel, and 13 possibilities, including amines, that's what, 104? Skilled artisans can visualize 104 possibilities. That's not hard. It's not just the 14 in Driscoll. Except that there are lots of compounds within the groups, which multiplies the number considerably. Yeah, but I think, Your Honor, first, the vast majority of that variation is in the hairpin background, and that doesn't count. I think everybody agrees it doesn't affect the binding. But even the notion that the amine group is among a larger set of groups, the jury didn't... There's simply no basis for thinking that those other groups are so overwhelming that the skilled artisan isn't going to see amines and doesn't recognize the possession of amines. When amines sit there and set out very directly as one of 13, you just can't miss it. And when you go to the synthesis schemes, it's amines in each and every one of those. And Sandoz's expert admitted that this is something that a skilled artisan, looking at the specification, would have recognized that the inventors were calling out the amines as something they were specifically interested in. What about your response... I just have one last question, which is, what is your response to the point that even R3 is something that varies? So even R3 is something that varies? Yeah. In looking at what the group is that relates to claim 30, it's got that R3 in it, and then you've got column 8 saying R3 can be this, that, or the other. But there's only three options there, which is methyl, ethyl, or isopropyl. That's simply not that big a deal, and everybody's going to recognize those as your sort of three basic hydrocarbon groups. There's nothing particularly... And the three most preferred R3 are claims, so there's no real written description on that because all three of those are claims. It's not as if those expand the possibilities and we have a narrow set of those. Each one, R3, methyl, ethyl, isopropyl, each is claimed. There's a precise correspondence for that one between what's disclosed and what's claimed, which means it can't affect the written description. What's in the spec is what's in the claim. Okay, I think we're out of time. Thank you, Your Honor. Mr. Jay, I'll give you three minutes. Great. Thank you very much. I'm going to do written description first and then turn back to the jury instruction. I want to disagree quite vigorously with the idea that Dr. Hethcock suggested that Z is just part of the backbone and is irrelevant. Not only have I cited you twice to the other side's expert admitting that that's wrong, there was also an exchange, unfortunately I don't have the page number for it, but I will get it for you, in which trial counsel asked Dr. Hethcock, this is the backbone, right? And he said, no, because you've included Z. And she said, no, I'm sorry, exclude Z. So Z is absolutely not part of the backbone. It is not something that could be dismissed. So now to the more fundamental question, Mr. Lampkin says, gosh, there's only 13 compounds and the 13 compounds include the amides. I want to just remind the court of two important things. One, which amides? All of these references to the amides don't necessarily mean the right amides. And then the second point is, each of these things has to be in combination with the rest of the molecule. There's enormous variation at X and there's variation at Z. And so for Mr. Lampkin to say, I've found a bunch of examples of phenyl in the tables. None of this was testified to at trial, by the way. This was something Mr. Lampkin came up with on appeal. But... Can we look at the written description beyond what was testified about? Sure. But... I just want to know. I mean... Yep. Right? It's part of evidence, right? We do not have a problem with that. But it is important... If Mr. Lampkin is going to talk about who's expert admitted to what, it's important to remember that no expert testified. It goes both ways. I hear you. And all those 10 phenyls, not one of them is connected to an amide. Nor does that get you anything about the enormous variation within X. Remember that X can drive which Z is preferred. And they don't have any explanation at all for how you get down from the X's in the priority application down to the subset of X's that are actually claimed. I think those are the key points on written description that I wanted to make, except, I guess, for one last reminder, which takes us sort of back to teaching away. Remember their teaching away testimony was better not be phenyl. So they certainly can't look to anything in the prior art to get phenyl at that Z position. On the jury instruction, just a couple things. I think Judge Stark, you had it exactly right. Teaching away is a fact question. So we testified that there was no teach away. They testified there was a teach away. That should have been refereed by the jury under a proper jury instruction and under the Tenth Circuit's standard for prejudice. What about the idea that the jury wasn't told what the implication was for teaching away? I understand the point, but I also think that if you look at the three places in which their expert uses teach away, the two that we talked about and 10664 is the third, that you can see that he's alluding to it as a legal concept. He's giving a conclusion? I think he's drawing authority from it. In other words, he's invoking this legal concept in front of the jury to say that I think the term is teaching away. In other words, he's cloaking his opinion in the legal terminology, but if he's going to do that, then you have to take the bitter with the sweet and have it judged under the correct legal standard. So all of this idea that this is just a Polaris argument, that's not how it was presented to the jury. They wanted something with more oomph, and that's why they invoked teaching away. Last point is just that the district court did not say, I'm not giving this instruction because it would be no prejudice. The district court said, one, I like the Federal Circuit Bar Association instructions, and two, I don't think they really are arguing teaching away, and I think that our quotation from their slide saying, science taught away from invention in two ways, and the quotes that we've given you have refuted that. Unless the court has any further questions? Okay, thank you Mr. Terry. Thank both counsel and cases for being here. That concludes our session for this morning.